## Busby v. State.

(In Banc. Oct. 19, 1936.)

[170 So. 140. No. 32004.]

**Harry Buchanan, A. F. Kelly** and **E. C. Fishel,** all of Hattiesburg, for appellant.

**E. C. Fishel,** of Hattiesburg, for appellant.

**Wm. H. Maynard,** Assistant Attorney-General, for the state.

**McGowen, J.**, delivered the opinion of the court on suggestion of error.

At the last term of this court this case was affirmed and a memorandum opinion filed. During the term a suggestion of error was filed and continued to this term of the court.

Upon a re-examination of this case on the suggestion of error we have decided to withdraw the former memorandum opinion and set aside the judgment heretofore rendered therein. We file this opinion in lieu thereof.

Upon an indictment charging W. A. Busby, the appellant, with murder in the killing of Hubert Wood, he was tried by a jury, convicted, and sentenced to be hanged, and from a judgment entered accordingly he appeals here.

In the forenoon of May 29, 1935, the appellant and the deceased, Wood, engaged in a difficulty which resulted in Busby stabbing Wood with a knife, from the effects of which he died in a very short time. According to the evidence, Wood lived with his mother in a house very close to that occupied by Busby and his wife and children; the houses were only about ten feet apart; both faced the highway just outside the city of Hattiesburg. Each lot was fifty feet wide and extended back a distance of about two hundred feet to a creek; wire fences inclosed both lots, and separated each from the other; there was also a fence on Wood's lot paralleling the division fence and three or four feet therefrom; and these two fences made a lane extending to the rear fence at the back of the lots. There appears to have been some vacant ground between the creek and the back of the lots.

Mrs. Wood testified for the state that she was sitting in a swing on her back porch on the morning of the

difficulty; that Ray Clark was sitting with her, and that Hubert Wood came out of the living room and, without speaking to either of them, went out the back door and turned down the lane; that she arose and ran to the door, Ray Clark preceding her, and that when she looked down the lane she saw Busby striking her son over the head with something that he had in his hand, she ran into her room and seized a gun; that when she was about halfway down the lane she saw blood streaming down her son's face; and that when she was within a few feet of them she saw Busby strike Wood again with something strapped to his wrist, which she supposed was a blackjack; that her son was standing trying to push Busby away from him; that she raised the gun to shoot, but feared she would shoot her son, so she started through the gate, and as she went through Busby snatched the gun from her and struck at Hubert, who dodged the blow, and Busby hit the tree; that Busby remarked as he grabbed the gun from her, "I'm gonna kill both of you God-damned son of bitches;" that the gun broke as it hit the tree, and then appellant hit Mrs. Wood with it; that the appellant held Hubert against the fence with his body, put his blackjack in his pocket and took something out of his pocket which she thought was a gun; that she could not tell whether he was opening a knife or what he was doing, but that she saw him pushing it toward her son; that when he stabbed Hubert he lunged forward and pushed Busby partly down, and when Busby raised up she grabbed the gun and struck him; that she struck Busby a second time; and that Hubert started staggering toward the house. On further examination she was positive that the struggle over the gun occurred subsequent to the time Busby inflicted the knife wound on Wood. It further appears that when the gun broke Mrs. Wood seized the barrel and used that in the fight, while Busby used the stock of the gun.

Ray Clark testified that the first thing he saw was Busby hitting Wood with something in his hand. He

then ran to a neighbor's for assistance and saw no more of the difficulty.

Harvison, a witness for the state, testified that he saw the difficulty after he left his house and was proceeding down the lane, and substantially corroborated Mrs. Wood's testimony, both of them saying that she hit Busby twice over the head with the gun barrel.

Wood fell in the lane and was conveyed promptly to a hospital, where he died in a few minutes. The physician who examined him at the hospital testified that he found three cuts on his head, that there was no fracture of the skull, but that both the skin and tissue had been cut in one place about an inch and a half to two inches long, extending from the front to the back of the head; that there was another wound about an inch long; that the knife wound entered the body at the left of the sternum between the fifth and sixth rib and pierced the right auricle of the heart, the range of the wound being slightly upward. Mrs. Wood also had scalp wounds on her head, one of which she exhibited to the jury and said that it had required some stitches.

The appellant's version of the killing was to the effect that he had assisted his wife in washing clothes that morning, and as he walked out on the back porch Wood, who was in the lane, called to him and said, "I want to talk to you;" that he walked on down the lane following Wood, thinking he wanted to have a private conversation; that as he started to crawl through the fence, and before he had straightened up, Wood struck at him, and that thereupon they engaged in a fist fight; that when they had struck five or six blows the next thing he knew somebody struck him from behind; that he looked around and saw Mrs. Wood standing there and drawing the gun back; that he grabbed the gun as she struck at him the second time, and struck her with his fist, which knocked the gun loose from her hands; that he then had the gun in his hands. Hubert had stepped back, and he had backed off to get out of Hubert's reach

in order to keep him from getting the gun; that he could have shot Wood but he clubbed him with the gun and the barrel fell on the ground, Busby retaining the stock; that Mrs. Wood picked up the barrel, Wood ran into Busby, and he struck Wood with the gun stock, and Mrs. Wood hit appellant again and knocked him away from Wood; that he fell, and as he was getting up Wood hit him and Mrs. Wood struck him again with the gun barrel. Appellant testified further that when Wood was striking him in that position he realized he was fighting for his life, that he got his knife out of his pocket, opened it, made an attempt to get up, and struck with the knife as he got up, and that he did not know whether he had cut Wood or not because his mind was blank for a second. He further testified that he received several blows on the head. He denied positively that he had stabbed the deceased with a knife before the battle with the gun started. He denied that he had used a blackjack or anything except his fists and the knife in the fight.

Busby's daughter corroborated his statement that Wood was the aggressor and struck her father as he went through the gap in the fence, and that Wood had something in his hand. The evidence of these two witnesses as to Wood being the aggressor in the beginning of this difficulty is not disputed. The daughter fled from the scene and did not see all that transpired there.

The physician who examined Busby at the jail found that he had a bruised eye and three wounds on his head of about the same character as those upon the head of the deceased.

After the conviction, there was a motion for a new trial, the details of which we will not set forth in view of the conclusion we have reached.

The court below granted the following instructions, among others, for the state:

(1) "The court instructs the jury for the state that if from all the testimony in the case you believe beyond a reasonable doubt that the defendant was feloniously

committing an assault and battery upon the person of the deceased, Hubert Wood, by means and use of some instrument capable of producing death or of doing him great bodily harm and that the mother of the deceased saw such assault being made upon her son and that she believed or had reasonable grounds upon which to believe that the life of her son was in imminent and impending danger of being feloniously taken at the hands of the defendant then the law permitted her to use such reasonable force and means as might reasonably appear to a reasonable and prudent person, under the circumstances, to prevent the death of her son or great bodily harm to him.''

(2) ''The court instructs the jury for the state that malice, such as to render one liable for acts committed thereunder may be formed instantly and need not dwell or reside in the bosom for any definite or fixed period of time but if malice exists and one acts thereunder he is responsible.''

(3) ''The court instructs the jury for the state that it is the probable consequence of the use of a deadly weapon in an assault and battery committed by one person on another, that the death of the party may ensue; and, hence, under the law, proof of such use is prima facie evidence of an intent to kill.''

(4) ''The court instructs the jury for the state that the killing of a human being, without malice, in the heat of passion is manslaughter.''

1. We are of the opinion that instruction No. 1 granted to the state was erroneous and prejudicially affected the rights of the appellant. This instruction undertook to justify the action of the mother in rushing to the scene of the combat with a loaded gun. The giving of the instruction unduly emphasized the action of Mrs. Wood, the state witness. She was not indicted so far as this record discloses, and was not on trial in this case. The instruction put upon the appellant, who was on trial for his life, the burden of defending the case insofar as the

charge of murder was concerned, and also of repelling this theory injected into the case by the state. An instruction of this character is proper on behalf of a defendant who is on trial but the state may not bolster up its own witness, not on trial, with such an instruction under the circumstances here. The state contends that it was proper to grant this instruction on the authority of McGehee v. State, 138 Miss. 822, 104 So. 150. In that case the instruction was given on behalf of a defendant on trial whose defense was in effect the same as that outlined by Mrs. Wood's evidence. We find no case where this instruction has ever been given except upon applicable facts interposed as a defense on behalf of a defendant. The instruction as given is not accurate in that it warranted the jury to rest a verdict upon what Mrs. Wood believed. If Mrs. Wood had been on trial, she could not have relied upon her own belief in rushing to the attack, but her action would have been judged by the jury as to whether or not the jury was of the opinion that she had a right to believe, under the circumstances, that her son was in danger, real or apparent, of losing his life or suffering great bodily harm.

2. We think there was no error in instruction No. 2 as to malice, and that it is not subject to the criticism of appellant.

3. In our judgment instruction No. 3 is not warranted, and the clause "and, hence, under the law, proof of such use is prima facie evidence of an intent to kill" renders the entire instruction erroneous. We think the jury might have been misled by this instruction. At best, the use of a deadly weapon is but an inference of fact as to an intent to kill and is not a presumption of law. We have repeatedly held that, where the facts are in evidence, presumptions yield thereto. In this case there was no dispute as to the fact that appellant stabbed the deceased with a knife. Intent in the crime of murder is a necessary part of malice. We think the same reason which has been applied to cases where the instruction

as to malice has been condemned is also applicable in condemning this instruction. In the case of Batiste v. State, 165 Miss. 161, 147 So. 318, the instruction under consideration was to the effect that malice might be presumed from the deliberate use of a deadly weapon. The court said: "It has been repeatedly held by this court that where all the facts and circumstances surrounding a homicide, or an alleged assault and battery with intent to kill and murder, are fully disclosed by the evidence, it is error to instruct the jury that the law presumes malice from the deliberate use of a deadly weapon. Walker v. State, 146 Miss. 510, 112 So. 673; Cumberland v. State, 110 Miss. 521, 70 So. 695; Smith v. State, 161 Miss. 430, 137 So. 96; Winchester v. State, 163 Miss. 462, 142 So. 454." The discussion of this point in Hawthorne v. State, 58 Miss. 778, fully illuminates the position of this court.

4. Instruction No. 4 purports to be a definition of manslaughter but is essentially erroneous. Section 996, Code of 1930, provides that "the killing of another in the heat of passion, without malice, by the use of a dangerous weapon, without authority of law, and not in necessary self-defense, shall be manslaughter." It will be noticed that the definition as contained in this instruction omits therefrom the phrases, "by the use of a deadly weapon, without authority of law, and not in necessary self-defense;" in other words, every man committing a homicide without malice, in the heat of passion, is guilty of manslaughter according to the instruction here under review. As the state saw fit in this case to instruct the jury on the crime of manslaughter, it would seem that it should have copied the statute. The instruction omits material elements of the crime of manslaughter. Perhaps we would not reverse this case because of this erroneous instruction if it stood alone. The appellant was convicted of murder, and therefore it cannot be said that the erroneous instruction as to manslaughter prej-

udicially affected him. Fleming v. State, 142 Miss. 872, 108 So. 143.

5. The falsus in uno, falsus in omnibus instruction was erroneous, in that the jury was not required to determine the facts therein set forth from the evidence. Butler v. State (Miss.), 170 So. 148; Powers v. State, 168 Miss. 541, 151 So. 730. The defendant requested no instruction on this point. The jury had to find that a witness had sworn falsely, etc., from the evidence and not from what the jury or members thereof may have known about the witness. It may be seriously doubted whether it was proper to give this instruction here, for the reason that the appellant was the only witness who testified in his behalf as to the details of the homicide, and the instruction pointed out the appellant and marked him for discredit. Pigott v. State, 107 Miss. 552, 65 So. 583, and authorities there cited.

We think there was a conflict in the evidence as to whether the defendant was guilty of murder or manslaughter, or whether he acted in self-defense, which made a case for the jury on these questions. Considering the several events to which we have called attention, we have determined that it is our duty to reverse the case and remand it for another trial in order that the appellant may be tried upon instructions properly announcing the law applicable to the facts of the case.

Reversed and remanded.

**Smith, C. J.**, dissents.

**Ethridge, J.**, delivered an opinion specially concurring.

I agree with the opinion written by the majority in this case, and think that the judgment of conviction should be reversed and the cause remanded for the reasons set forth therein. But I also think that the case should be reversed for the additional reason that, on the facts contained in the record, an insufficient period of time was

allowed for the investigation of the case before it was set for trial. What constitutes a reasonable time for investigation by an attorney appointed to defend a murder case depends upon the facts in each case, and the opinion of the trial court in that regard will be given due weight; but in the last analysis this question must be determined in the light of all the facts developed in the trial. I may say, however, that where a person is accused of murder or other capital felony, the case should not be set for trial until counsel appointed by the court has made preliminary investigation, and has had sufficient opportunity to learn the pertinent facts, including the status of public opinion as to the guilt or innocence of the accused. Before setting such case for trial, the judge should inform counsel that he will be allowed reasonable time for a full and complete investigation of the case, before being called upon to announce whether he is ready, or may safely go to trial. The judge should take into consideration the nature of the case insofar as it is known to him, the time probably needed for seeing and consulting witnesses, whether there will be difficulty in reaching them, as well as the connection with the attorney so appointed with other cases pending in the court which may require attention. Section 26 of the Constitution of Mississippi provides: ''In all criminal prosecutions the accused shall have a right to be heard by himself or counsel, or both,'' etc. Section 1262, Code of 1930, requires the court, in capital felonies, to furnish counsel for the accused if he is unable to employ counsel himself. This right to be represented by counsel includes all the rights incident thereto, reasonable time and opportunity for a full investigation of all the pertinent facts, and consultation with such witnesses as he may have for his defense. Cooley on Const. Lim. (8 Ed.), pp. 700, 701; Sheppard v. State, 165 Ga. 460, 141 S. E. 196; Reliford v. State, 140 Ga. 777, 79 S. E. 1128; McArver v. State, 114 Ga. 514, 40 S. E. 779; Sanchez v. State, 199 Ind. 235, 157 N. E. 1; Batchelor v. State,

189 Ind. 69, 125 N. E. 773; Mitchell v. Commonwealth, 225 Ky. 83, 7 S. W. (2d) 823; Jackson v. Commonwealth, 215 Ky. 800, 287 S. W. 17; State v. Collins, 104 La. 629, 29 So. 180, 81 Am. St. Rep. 150; State v. Pool, 50 La. Ann. 449, 23 So. 503; People ex rel. Burgess v. Risley, 66 How. Prac. (N. Y.) 67; State ex rel. Tucker v. Davis, 9 Okl. Cr. R. 94, 130 P. 962, 44 L. R. A. (N. S.) 1083; Com. v. O'Keefe, 298 Pa. 169, 148 A. 73; Shaffer v. Territory, 14 Ariz. 329, 127 P. 746; Powell v. Alabama, 287 U. S. 45, 53 S. Ct. 55, 60, 77 L. Ed. 158, 84 A. L. R. 527.

In this last case the Supreme Court of the United States held that the denial of the right to have counsel to defend one charged with a capital felony was a violation of the due process clause of the Fourteenth Amendment to the Constitution of the United States, regardless of whether the state had a constitutional or statutory provision to that effect or not. The Alabama Supreme Court had held, on the facts there involved, that the State Constitution allowing the benefit of counsel had not been violated. The provision of the Alabama Constitution (Const. 1901, sec. 6) was that in all criminal prosecutions the accused shall enjoy the right to be defended by counsel; and in a capital case, where the accused is unable to employ or procure counsel, the court is required to appoint counsel for him. The United States Supreme Court said: "The state Supreme Court held that these provisions had not been infringed, and with that holding we are powerless to interfere. The question, however, which it is our duty, and within our power, to decide, is whether the denial of the assistance of counsel contravenes the due process clause of the Fourteenth Amendment to the Federal Constitution," and held on the facts there involved that it did. However much one might on legal reasoning and historical learning be disposed to disagree with the court's holding, it is the law of the land, which every state and federal officer is bound, by the United States Constitution, to abide by and follow. At the time the Federal Con-

stitution was adopted it was not, apparently, regarded by the framers of that instrument and the states adopting it as being a part of the due process of law. It was a right specially mentioned in the first ten amendments and placed there alongside the due process of law clause. Likewise, it was specially mentioned in most of the state constitutions then in existence. Due process originally did not embrace the right to counsel in England. It was there understood to require a law certain in its terms, with a proceeding on notice and a hearing before final judgment was pronounced. The Supreme Court recognized the difficulty, saying (287 U. S. 45, at page 60, 53 S. Ct. 55, 61, 77 L. Ed. 158, 166, 84 A. L. R. 527): ''If recognition of the right of a defendant charged with a felony to have the aid of counsel depended upon the existence of a similar right at common law as it existed in England when our Constitution was adopted, there would be great difficulty in maintaining it as necessary to due process. Originally, in England, a person charged with treason or felony was denied the aid of counsel, except in respect of legal questions which the accused himself might suggest. At the same time parties in civil cases and persons accused of misdemeanors were entitled to the full assistance of counsel.'' The court then reasoned that all of the Colonies at the time of, and before, the Revolution, had repudiated the practice in England, and the right of counsel was secured in all, or practically all, of the Colonies. It pointed out that in a long line of decisions (cited in the opinion) the right to counsel had become a part of the fundamental rights of an accused person. In many of these cases decided by the Supreme Court of the United States, due process of law, as applied to state action, is regarded as being violated whenever the state fails to comply with what the said Supreme Court regards as inconsistent with the fundamental principles of liberty and justice. Hebert v. Louisiana, 272 U. S. 312, 47 S. Ct. 103, 71 L. Ed. 270, 48 A. L. R. 1102, and cases cited therein. Personally I think this

too indefinite a criterion to conform itself to the principles of due process of law, as laid down in United States v. L. Cohen Grocery Co., 255 U. S. 81, 41 S. Ct. 298, 65 L. Ed. 516, 14 A. L. R. 1045, and that it should be redefined in the interest of precision. What was evidently meant by the Fourteenth Amendment was that the law should be certain in its meaning, and that reasonable notice and hearing should be had, and whatever other safeguards the state provides should be secured to all. If this is done at all, it will probably have to be by constitutional amendment. It would be well to have this term accurately defined in order to do away with uncertainty which, should the Supreme Court of the United States ever be so disposed, would give it arbitrary power to shackle state action. Under a constitutional government there must be some power authorized to finally decide and define legal terms, and what the law is. That power in relation to the meaning of the Federal Constitution is vested in the Supreme Court of the United States; and its decisions, right or wrong, must be followed by courts inferior to it. Personal opinion must give way before the pronouncements of authority, and the judges of inferior courts should conform their judicial opinion to the law so declared. The rule announced by the Supreme Court of the United States in the Powell case, supra, in regard to the right of the accused to have counsel, is in accordance with the holding of state courts on that subject under state constitutional provisions guaranteeing that right. See state cases, supra. It is true that to some extent this may delay criminal trials, but in this state every county save one has at least two weeks of circuit court, and, if a case be begun during the term, it may be continued until it is finished. The United States Supreme Court recognized this delay as being a possible handicap in administering the law. In the Powell case, supra, 287 U. S. 45, at page 59, 53 S. Ct. 55, 77 L. Ed. 158, 84 A. L. R. 527, it said: "It is true that great and inexcusable delay in the enforcement of our criminal

law is one of the grave evils of our time. Continuances are frequently granted for unnecessarily long periods of time, and delays incident to the disposition of motions for new trial and hearings upon appeal have come in many cases to be a distinct reproach to the administration of justice. The prompt disposition of criminal cases is to be commended and encouraged. But in reaching that result a defendant, charged with a serious crime, must not be stripped of his right to have sufficient time to advise with counsel and prepare his defense. To do that is not to proceed promptly in the calm spirit of regulated justice but to go forward with the haste of the mob.''

In the present case the court term fixed by law was four weeks. The indictment was promptly returned the first day of the term. There was no need to set the case at once for trial; it could well have been deferred without endangering the power of the court to deal with it fully during the term. The insufficiency of time for full preparation was alleged in the motion for a new trial, and supported by evidence. In such cases it would be wise to defer the setting for trial until counsel for the accused shall have full opportunity for inquiry into the facts, and for development and preparation of the defense. Often facts are not easily ascertained by counsel appointed during the term, and other business may interfere with his preparation of the case—this should be borne in mind. In my opinion, the responsibility of the trial judge does not end with the appointment of counsel; he should see that the defense is properly made, and that his appointee is both competent and diligent. See Robinson's Elementary Law, 671, sec. 597; Cooley's Const. Lim. (8 Ed.), p. 704; 8 R. C. L. 84, sec. 4. Human life, even of one accused of murder, is too sacred to be experimented with. Before his life is forfeited or his liberty confiscated, the accused should be assured of a full defense and a fair trial.

**Griffith, J.,** delivered an opinion specially concurring.

While the majority opinion is accepted as correct in reversing this judgment because of instructions, it seems to me that the outstanding ground upon which our decision should be based is the fundamental proposition that the trial of appellant did not conform to the essential requirements of due process of law.

It is highly desirable that trials for crime should not be unreasonably delayed, and that justice should be fairly prompt, but in such matters the speed limit can be exceeded to the detriment of a proper administration of the law, as well as those other excesses in speed which produce dangers to life and limb. That there was an excess of judicial speed in this case, a statement of the facts in that regard will at once disclose.

The homicide occurred about ten o'clock on the morning of May 29, 1935. Appellant was arrested within an hour and placed in jail. That night he was taken to jail in another county. If appellant had any friends or relatives who could or did take any effective interest in him, the record does not disclose it. Circuit court convened on Monday, July 1, 1935, for a four-week term. On the night before appellant was brought back to the local jail. Immediately after the noon recess on the first day of court the grand jury returned an indictment against appellant for murder, and at two-thirty P. M. of the same day appellant was arraigned. On being asked by the court whether he had counsel, appellant replied that he had none, and that because of his poverty he had been unable to procure the services of counsel. Thereupon the court appointed as his counsel a member of the bar who was unacquainted with appellant or with the facts of the case; and, so far as the record discloses without any inquiry to appointed counsel as to how long it would require him to get ready in the defense, the court set the case for Wednesday morning at eight-thirty o'clock, July 3, 1935, and required counsel to announce

whether a special venire was desired, and, reply being made in the affirmative, a special venire was at once drawn and placed in the hands of the sheriff.

That afternoon appointed counsel had a forty-five-minute consultation with appellant, at which appellant told counsel that the only eyewitnesses to the homicide were himself and the mother of the deceased; that he knew of none other, except his wife, who when she reached the courthouse the following day was found to be in such a hysterical condition as to be unable to render any service either in consultation or as a witness. Counsel spent a part of that night in a review of the law in such cases, and, although unwell, devoted as best he could the following day and a part of that night to searching for witnesses. Among others, he went in search of one Dean, whose name appeared as a witness on the back of the indictment, but was unable to find him, nor did he locate any other witness who could throw material light on the facts.

On Wednesday morning appointed counsel was still unwell, having been so the day and night before, and he requested the aid of additional counsel, and this additional counsel, who also knew nothing of the parties or the facts, entered at once into the trial, and conducted the burden of the examination of the witnesses. On the trial there appeared one Harvison as a witness for the state, and who claimed to have been an eyewitness, and his testimony was of the most damaging character. The trial was concluded on Wednesday, July 3, 1935, and resulted in a verdict of guilty with a death sentence.

Some days after the trial and before the adjournment of the term a motion was made for a new trial, wherein the above facts were set forth and proved by witnesses, and the further facts were shown that the witness Dean and two other witnesses had been found who would testify, and who did testify on the motion for a new trial, that the witness Harvison was not at the scene of the homicide and could not have witnessed the incriminating

facts testified to by him in the trial, and without whose testimony a different result might have been reached, and probably would, and certainly as to the death penalty, assuming that the jury was without any bias whatever.

In Powell v. Alabama, 287 U. S. 45, 53 S. Ct. 55, 77 L. Ed. 158, 84 A. L. R. 527, the Supreme Court, in announcing that the right of one charged with a capital offense to be represented by counsel is a fundamental requisite of due process of law, declared that that requirement must be met in substantial effect, and in a real sense, and that, if a reasonable opportunity for consultation, thoroughgoing investigation, and preparation was not afforded between the time of the appointment of counsel and the date set for trial, the right of representation by counsel would be as much denied as if such representation were refused by the court in the trial itself.

There is no other responsibility in life so serious as that laid upon counsel in the defense of a capital case. No lawyer, although a veteran of a thousand battles in the criminal courts, would willingly accept employment even for an adequate cash fee, when the employment is on the afternoon of Monday, and the trial is to be had beginning on the following Wednesday morning, unless the facts and all the facts had theretofore been carefully investigated by a competent and reliable person, and all the possible witnesses were known at the time, and were immediately available for consultation. But that advantageous situation was not present here. On the contrary, the appointed counsel had to start at the beginning, and make the entire investigation both as to the law and the facts, including the hunt for witnesses, and with a client who could render but little, if any, aid. Moreover, it is of vital importance that counsel, suddenly brought into a capital case of which he knows nothing, should have a reasonable time to inquire into the state of the public mind, and as to whether

there has been any general prejudgment of the issues, or whether there is any special group that is active in behalf of the prosecution, and in that connection to examine into the names drawn on the special venire taken from throughout the county. Here there was, in effect, no time at all for the inquiries next above mentioned, when considered along with the fact that appointed counsel was obliged to make all the other preparations and investigations, including searches for witnesses. That the time here allowed was unreasonably insufficient under the full facts of this case is so clear that there could scarcely be any serious disagreement among impartial persons unconnected with the trial, whether judges, lawyers, or observant laymen; and an unreasonably insufficient time is in legal effect the same as no time at all.

And what was the hurry, what was the occasion for any such haste? There was a four-week term, yet all this transpired in the three opening days. And does such haste in such serious cases save any time? On the contrary, in the almost inevitable want of deliberate calmness in such hurried up trials, reversible error nearly always gets in, as has happened in this case, and in several others not so far in the past, which were handled in the trials with nearly but not quite so much speed as this one. The average result, therefore, in such hurried cases is delay rather than dispatch, with the attendant expense of new trials, and more months of languishing in the various jails while defendants await the new trials. Both as a matter of the saving of time in the average of final results, and in the preservation of that indispensable feature that court trials of serious cases must be a calm, dispassionate, impartial, and deliberate manifestation of the judicial power and conscience of the state, the trial judges ought to and must conform to the spirit as well as the letter of the rule laid down in the Powell case, which declares the supreme law of the land upon the fundamental question here discussed.

And it is immaterial that appointed counsel made no objection and asked for no further time. It may be that appointed counsel supposed that, since he was obliged to accept the appointment, he was obliged also to accept the trial date without objection. But, whatever was the reason for the failure of counsel to object to the inadequate time, or to request further time, the failure to object is immaterial, for, when a proceeding fails to conform to due process, the judgment is void, and may be attacked or the point raised at any time, anywhere, and in any manner. See cases cited in Carraway v. State, 170 Miss. 685, at pages 689, 700, 154 So. 306, 308, 312, and see, also, Powell v. Alabama supra, and Brown v. State, 297 U. S. 278, 56 S. Ct. 461, 80 L. Ed. 682.