242 So.2d 420 (1970)
Fred PETERSON
v.
STATE of Mississippi.
No. 46085.
Supreme Court of Mississippi.
December 21, 1970.
*421 Harold J. DeMetz, Gulfport, for appellant.
A.F. Summer, Atty. Gen., by Velia Ann Mayer, Sp. Asst. Atty. Gen., Jackson, for appellee.
RODGERS, Justice:
This case came to this Court from the Circuit Court of Stone County, Mississippi, in which the appellant, Fred Peterson, was indicted on a charge of having murdered Henry Lee Bond, a Negro policeman. He was tried, convicted and sentenced to suffer death.
The facts leading up to the tragedy, as told by State witnesses in the main, are as follows.
Katheryn Johnson, a Negro woman, lived with the appellant, Fred Peterson, and they had four children although they were not married  this fact is not material except for the reason later observed. On the afternoon of June 28, 1969, Katheryn Johnson went to the "Dew Drop Inn" cafe in "Red Quarters." The appellant came to the cafe and a short time thereafter asked Katheryn Johnson to go. She told him she was not ready to go; an argument ensued, and Fred Peterson fired a pistol at or near Katheryn Johnson. Whereupon, she left after advising Fred Peterson that she was *422 going to call the city marshal. Her brother and sister went with her and Fred Peterson followed them. He shot by her feet knocking gravel on her legs. Katheryn Johnson and her brother and sister went into the home of Mr. and Mrs. Myers and she hid in the bathroom. The appellant came to the Myers house but he was met at the door by Mrs. Myers who refused to permit him to enter the house. While she was talking to Fred Peterson, Henry Bond, a city policeman, arrived. He was dressed in his policeman's uniform. The policeman asked appellant what was going on, to which appellant replied "family trouble." The officer said "Well, family trouble don't consist of shooting in the streets." The appellant said "Who told you  prove it." Whereupon, the appellant put his pistol against the temple of the officer and told the officer that he had been wanting to kill him. Mr. Myers, who was there, struck the pistol down. The appellant again put the gun to the head of the officer and said "I am going to count to three and I am going to kill you." The officer seized the appellant but the appellant succeeded in shooting the officer in his body. The officer then released the appellant and started toward his truck, but the appellant "snatched his (the officer's) pistol out of his scabbard" and shot him again with the "big gun" twice. The officer fell near his truck and later died "on the way to the hospital." The appellant ran from the scene barefooted. He stopped near the home of Katheryn Johnson's sister and told her that he did not hurt her sister but that he had shot "Pat." Pat was the nickname of Henry Bond. The witness observed that the appellant had two pistols.
The appellant testified that on the date in question he went to the "Dew Drop Inn" to get Katheryn Johnson to go home to see about the children. He admitted that he had been drinking and that he got in an argument with Katheryn. He admitted that he fired his pistol at her side. He did not remember shooting at her in the street. He said that Mrs. Myers let Katheryn Johnson in the house but would not let him enter. He was about to decide to give his gun to Mr. Myers when the policeman arrived. He got into an argument with the policeman about his shooting in the street. He contends that he started to walk off but that the policeman pulled him back and went for his gun. Appellant says that he grabbed his hand. He said that he was afraid of the policeman because the officer had threatened him. He denied that he pulled his gun and put it up to the officer's head. He said that he tussled with the officer over the officer's gun and that the gun went off and he thought he was shot. He denied any tussling at the truck, but he followed the officer to the truck to talk to him and did not know that the officer was shot until he fell. He admitted taking the officer's keys when he left. He said he never took the .22 pistol out of his pocket until he left the scene and that he lost it en route to his mother's place. He admitted passing through Lula McCray's yard (Katheryn Johnson's sister). He later surrendered to the officers and went with them to look for the pistol, but could not find it.
There were other witnesses, but the foregoing are essentially the facts as to how the killing occurred.
The appellant has presented twelve assignments of error which are alleged to have occurred during the trial of the case in the circuit court and for which appellant contends that he is entitled to a new trial. The errors assigned are as follows:
1. The trial court erred in overruling appellant's motion to quash the indictment.
2. The court erred in failing to sustain a motion to change the venue of the trial.
3. The admission of certain exhibits into evidence was prejudicial and was reversible error.
4. The court erred in releasing six prospective jurors who did not believe in capital punishment.
*423 5. The court erred in refusing the appellant a certain jury instruction and in allowing the State another instruction, numbered 2.
6. The court erred in permitting the district attorney to refer to the deceased's war record in his final argument and a statement referring to deceased "dying like a dog" and defendant shooting deceased down "like a dog in the streets."
7. The court erred in accepting the guilty verdict of the jury because it was biased and prejudicial.
8. The court erred in overruling a motion made at the conclusion of the evidence for the State asking the court to exclude the evidence offered by the State and to dismiss the prosecution.
9. The court erred in not granting a new trial.
10. The court erred in permitting the first attorney appointed by the court to withdraw from the trial.
11. The court erred in imposing the death penalty sentence upon defendant.
12. And for other reasons to be shown on the hearing.
The first assignment of error is based upon shop-worn theory that there were not enough Negroes on the Grand Jury because Negroes have not been summoned for jury duty in Stone County, which from past records indicated systematic exclusion of Negroes from jury duty in violation of the equal protection clause of the Fourteenth Amendment to the Federal Constitution. The trial court granted an evidentiary hearing on this motion and it developed that Stone County had a total population of only 7,013 people, of which 1,709 were Negroes and 5,302 were Caucasian.
The appellant complains that he was only allowed to go into the records of the jury list for a period of four years, XXXX-XX-XX-XX; that of 542 names, 100 were Negroes on the 1969 jury list and these were wrongfully included because they were of "good intelligence, reliable and responsible jurymen"; that the Grand Jury in August 1969 contained no Negroes; that the petit jury for 1969 did contain two Negroes. The record shows also that there were 4200 qualified electors in Stone County in 1969 and that the voter registration book did not indicate sex or race and at no time was any effort made to exclude Negroes from the jury. It also appears that at one time few Negroes were registered voters, and until the judge ordered the board of supervisors to include freeholders on the jury list, the board of supervisors had a limited number of qualified Negroes available for jury service. The record further shows that in 1968-1969 the jury list of 350 names contained 18 Negroes. Although there were no Negroes on the 1968 January term of court, two Negroes were included on the first and second weeks' jury list.
The trial judge, after having heard the testimony on the motion, reached the conclusion that "there was no systematic exclusion of Negroes from the jury list at the time the indictment was returned." The court pointed out that as more Negroes were qualified by qualifying as electors, more names were added to the jury list. An examination of all the testimony introduced on this motion convinces us that the trial court was correct in its ruling and the motion was properly overruled. See cases collected in Note 1, Black v. State, 187 So.2d 815, 818 (Miss. 1966). The facts in the instant case are not similar to the facts that were at issue in Shinall v. State, 187 So.2d 840 (Miss. 1966).

Motion to Change Venue
The appellant contends that the motion to change venue of the trial of the charge against the defendant, Fred Peterson, should have been sustained because of "grudge and ill will toward the defendant in the public mind." The defendant called 15 witnesses to substantiate his contention, *424 and of those testifying, only two witnesses testified that in their opinion the defendant could not get a fair trial in Stone County and one of these was an attorney who had been permitted to withdraw from the appointed defense of defendant. The other witnesses for movant either did not know or stated that they believed the defendant could obtain a fair hearing.
The State introduced as witnesses the sheriff, the circuit clerk and the county prosecuting attorney, all of whom testified that the defendant could get a fair trial in Stone County. The appellant also points out that there were other attorneys in Stone County who could have been appointed to defend the defendant and that the failure to appoint a local attorney indicated that there was considerable local prejudice against the defendant. We are not able to reach the conclusion or form the inference from the record indicated by the appellant because all trial judges in serious murder cases usually appoint persons they feel are capable criminal lawyers and seldom appoint civil lawyers. Moreover, the record shows that the mother of the defendant did not feel that one local lawyer could or would adequately represent her son.
A careful consideration of the foregoing evidence and the answers given by the prospective jurors leave no doubt in the minds of the members of this Court that the trial court did not commit reversible error in failing to change the venue at the time the motion was heard.
We find no error in appellant's contention that he was not furnished all the tangible evidence to be used by the State in the prosecution of the defendant. In the first place, the court ordered the officers to make available for the defendant's inspection such tangible evidence as the prosecution expected to use. The record does not reveal that the defendant or his attorney ever requested to see the evidence later offered by the prosecution.
In the second place, there is no rule requiring the State to divulge its entire case to the defendant. The discovery rule is directed toward physical evidence in the possession of the prosecution. The motion to divulge evidence is addressed to the sound discretion of the trial court to insure a fair trial and it is ordinarily granted within reasonable limits so as to preserve and safeguard the evidence. See cases collected in Armstrong v. State, 214 So.2d 589 (Miss. 1968).
It may be possible to imagine instances when the failure to require the State to divulge evidence would be so unfair as to deny due process or a fair trial within the meaning of the State and Federal Constitutions, but we are unable to find that the defendant's case was prejudiced by the fact that the attorney was unaware of the evidence introduced in the instant case.
The appellant contends that the trial judge committed reversible error in dismissing for cause six prospective jurors who had conscientious scruples against the death penalty. After each of these jurors had said he did not believe in the death penalty, he was then asked by the trial judge similar questions to the following question asked Mrs. Thompson, one of the prospective jurors.
As it has been pointed out in this case, Mrs. Thompson, one of the verdict [sic] in this case under the law could result in the infliction of the death penalty and you have stated that you do not believe in the death penalty, that you have conscientious scruples against capital punishment, is that correct?
She answered "Yes." The judge then asked:
I will ask you now since you have so answered, I will ask you whether or not you could nevertheless follow the testimony of the witnesses and the instructions of the Court and return a verdict of guilty although that verdict could result in the death penalty if you being the *425 judges of the weight and worth of the evidence are convinced of the guilt of the defendant and the circumstances warrant such a verdict, could you then return a verdict that would result in the death penalty?
a. I still don't believe in death penalty verdict.
q. You tell me that you could not follow the law 
a.  No Sir I just don't believe in it 
q. Under any circumstances?
a. No, Sir. I don't believe it.
BY THE COURT: Well answer my question if you will?
a. Yes Sir I will answer it: I don't believe in a death penalty verdict.
q. And you could not follow the law in that regard?
a. No, I would not be able to.
BY THE COURT: Alright Mrs. Thompson, you will step down.
In another instance the court asked one of the jurors:
q. I will ask you whether or not, nevertheless, you could follow the testimony and the instructions of the Court and return a verdict of guilty although this verdict could result in the death penalty, if you being the judges of the weight and the worth of the evidence are convinced of the guilt of the defendant and the circumstances warrant such a verdict, you could not then return a verdict resulting in the death penalty?
a. No, Sir.
BY THE COURT: Alright you will step down Mr. Hunt.
The voir dire examination of Gladys Brown was as follows:
a.  I do not believe in capital punishment.
q. You don't believe in capital punishment? You tell me that in any case, regardless of the circumstances, you could not return a verdict of capital punishment, is that right?
a. I could not, in any case.
* * * * * *
BY THE COURT: Since you have so answered, then I ask, nevertheless, you whether or not you could follow the testimony of the witnesses and the instructions of the Court and return a verdict of guilty although that verdict could result in the death penalty, if you being the judge of the weight and the worth of the evidence are convinced of the guilt of the defendant and that the circumstances would warrant such a verdict? Could you then return such a verdict that would result in the death penalty?
a. No, Sir.
q. You couldn't even consider the testimony? Your answer is no?
a. That's right.
BY THE COURT: Gladys Brown you will step down.
On voir dire examination Lester Hester gave the following answers to questions from the State, the Court and defense counsel:
a. I don't believe in capital punishment.
q. You don't believe in capital punishment?
a. No.
q. You tell me that you could not sit on the jury and follow the instructions of the Court and if you felt the circumstances warranted it return a verdict of capital punishment, in any case?
a. No.
* * * * * *
q. I will ask you whether or not you could follow the testimony of the witnesses *426 and the instructions of the Court and return a verdict of guilty although such a verdict could result in the death penalty, if you being the judge of the weight and of the worth of the evidence are convinced of the guilt of the defendant and the circumstances warrant such a verdict?
a. No, Sir I could not.
* * * * * *
q. What I am trying to get at is you could consider the different verdicts, could you not? You could listen to the weight of the evidence and the testimony and consider the verdicts, could you not?
a. I don't believe I could.
The appellant contends that dismissing these jurors who say that they could not consider the death penalty and would not follow the instructions of the court was a violation of the rule expressed by the United States Supreme Court in Witherspoon v. State of Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968).
We do not agree with appellant's interpretation of the Witherspoon case. Witherspoon simply holds that once the juror has expressed his conscientious scruples against the death penalty, he should not be discharged as a juror until it is developed that the juror will not consider the death penalty or the instructions of the court on the extreme penalty. We hold this to be the rule in this state. Moore v. State, 237 So.2d 844 (Miss. 1970); Armstrong v. State, supra.
We find no error in the court's action in discharging persons who could in no event follow the law, and would not consider prescribed penalties. The solemn edicts of society manifested by legislative enactments must be considered as well as the personal feelings of prospective jurors in determining the course of judicial inroads on statutory law.
The appellant contends that the court committed reversible error in refusing the appellant the following instruction:
The Court instructs the Jury for FRED PETERSEN [sic] that both intent and malice aforethought are absolutely essential elements of the crime of murder, and before you the Jury can convict FRED PETERSEN [sic] of murder as charged, all twelve of you must be satisfied beyond all reasonable doubt, and to a moral certainty that FRED PETERSEN [sic] did kill HENRY LEE BOND after forming the full intent in his mind and in his heart to kill him, and in addition that FRED PETERSEN [sic] did kill HENRY LEE BOND with malice aforethought; that is to say that before anything at all was done by FRED PETERSEN [sic] that he must have deliberated with himself, firmly resolved in his mind and in his heart to murder HENRY LEE BOND and then FRED PETERSEN [sic] must have settled down with this firm determination to deliberately murder HENRY LEE BOND. Unless these elements are proved to all of you and unless all of you believe they existed at the time of this incident beyond all reasonable doubt and to a moral certainty, it is your sworn duty to find that FRED PETERSEN [sic] is not guilty of the crime of murder as charged in the indictment.
The court granted the foregoing instruction after deleting the following clause: "* * * [T]hat is to say that before anything at all was done by FRED PETERSEN [sic] that he must have deliberated with himself, firmly resolved in his mind and in his heart to murder HENRY LEE BOND and then FRED PETERSEN [sic] must have settled down with this firm determination to deliberately murder HENRY LEE BOND. * * *"
We think that this clause was properly deleted from the proffered instruction because it indicates a waiting period to "settle *427 down." We have often held that no definite time is required to form a design to kill, but if a malicious intent were there at the time of the killing, the slayer is guilty of murder. Mills v. State, 196 Miss. 287, 17 So.2d 215 (1944); Tatum v. State, 176 Miss. 571, 169 So. 841 (1936); Martin v. State, 163 Miss. 454, 142 So. 15 (1932); Durrah v. State, 44 Miss. 789 (1871); Lambeth v. State, 23 Miss. 322 (1852). Moreover, Instruction Number 7 for the defendant fully covers "full intent" and "malice aforethought."
The appellant argues that Instruction Number 2 granted the State is erroneous. This instruction is as follows:
The Court instructs the jury for the State that the malice aforethought mentioned in the indictment does not have to exist in the mind of the slayer for any given length of time; and if at the very moment of the act of violence, if any, the defendant, Fred Peterson, acted with the deliberate design to take the life of Henry Lee Bond, and not in necessary self-defense, real or apparent, then it was as truly malice and the act was as truly murder as if the deliberate design had existed in the mind of the defendant for minutes, hours, days, weeks, or even years.
This instruction in one form or another, has been approved by this Court for many years. See Lambeth v. State, supra; Mills v. State, supra; Durrah v. State, supra; Carter v. State, 198 Miss. 523, 21 So.2d 404 (1945); Hudson v. State, 185 Miss. 677, 188 So. 561 (1939); Busby v. State, 177 Miss. 68, 170 So. 140 (1936); Johnson v. State, 140 Miss. 889, 105 So. 742 (1925); Huddleston v. State, 134 Miss. 382, 98 So. 839 (1924). This instruction is to be distinguished from an instruction stating "if the design to kill exists but for an instant [etc.]" See McDonald v. State, 78 Miss. 369, 29 So. 171 (1900).
The argument that the State's Instruction Number 2 above quoted does not contain the word "intent" and is, therefore, erroneous is not well taken because the instruction expressly states: (If) "the defendant, Fred Peterson, acted with the deliberate design to take the life of Henry Lee Bond, * * *" This phrase connotes "intent" to kill. Intent to kill, coupled with malice aforethought in a murder instruction, is sufficient. Cunningham v. State, 87 Miss. 417, 39 So. 531 (1905).
Moreover, the defendant obtained two instructions (4, 8) which clearly required criminal intent before the jury was authorized to convict the defendant.
The defendant contends that the argument of the district attorney in which he eulogized the deceased policeman as having a good war record and stated that "he was shot down like a dog on the streets there that day" or "he left him laying on the street like a dog" was inflammatory and so prejudicial to the rights of defendant as to require a new trial.
We are of the opinion that the argument of the prosecuting attorney before the jury is not a reversible error for two reasons.
First, the defendant and his attorney made no objection to the argument before the jury retired. This rule has long been a requirement in this state if an objection is to be predicated on the argument of the attorney unless, of course, it is so inflammatory as to necessitate the intervention of the trial judge. See Collins v. State, 202 So.2d 644 (Miss. 1967); Coburn v. State, 250 Miss. 684, 168 So.2d 123 (1964); Bond v. State, 249 Miss. 352, 162 So.2d 510 (1964).
Second, attorneys are necessarily given considerable latitude in their argument to a jury, and, where their arguments have some basis of fact, attorneys may draw conclusions from their version of the evidence, and the mere fact that they use strong hyperbolic symbols or illustrative parables does not constitute reversible error. Smith v. State, 187 Miss. 96, 192 So. 436 (1939); Bradford v. State, 166 Miss. *428 296, 146 So. 635 (1933); Pittman v. State, 147 Miss. 593, 113 So. 348 (1927); Shows v. State, 103 Miss. 640, 60 So. 726 (1912); Gray v. State, 90 Miss. 235, 43 So. 289 (1907). See also the cases collected in King v. State, 251 Miss. 161, 168 So.2d 637 (1964).
This Court said in Cavanah v. State, 56 Miss. 299 (1879), that:
* * * Undoubtedly, there is a limit to the latitude to be allowed to counsel in addressing a jury, and it is the duty of the court to interfere to prevent an abuse of the privilege of counsel, to the perversion of justice, by misstating facts or commenting on facts not in evidence. A large discretion in this matter must be exercised by the circuit judge. It is a very delicate duty; for he must be cautious not unduly to abridge the liberty of counsel, and, in restraining him within proper limits, must not deny him the full liberty of discharging his important duties, in enforcing his views of the law and the evidence. "His illustrations may be as various as are the resources of his genius; his argumentation as full and profound as his learning can make it; and he may, if he will, give play to his wit, or wing to his imagination."
Where the privilege of counsel had been abused to such an extent as to induce the belief of probable injustice as its result, and the court below had not properly interposed, we would not hesitate to apply the corrective; but in this case we see no ground for interference. * * * (56 Miss. at 309, 310)
We find no merit in the assignments of error that the court should not have accepted the verdict of the jury because it was alleged to have been prejudicial; nor, in the assignment of error that the court should have directed a verdict on the ground that the testimony of Mrs. Myers "was apparently rehearsed" on the theory that the testimony of the defendant was the only reliable evidence before the jury.
We have detailed the assignments of error alleged to have been committed and have demonstrated that each error, standing alone, is insufficient to cause a reversal of this case. After extensive study and repeated conferences on this case, Justices Rodgers, Jones, Brady, Patterson and Smith are convinced that a new trial should be had in another county.
The foregoing Justices base their conclusion upon the following ground. After the defendant, Fred Peterson, had been convicted and sentenced, his attorney filed a motion for a new trial based upon the ground (among others) that the venue of the case should have been transferred to another county. This motion was overruled and a majority of the Justices of this Court are convinced that the action of the trial court was erroneous and is a reversible error.
It has been pointed out by this Court on several occasions that it is the duty of all courts to insure that every person obtains a fair and impartial trial. This duty to require a fair trial is the cornerstone of our judicial process. See Jefferson v. State, 52 So.2d 925 (Miss. 1951); Dickerson v. State, 54 So.2d 925 (1951); Floyd v. State, 166 Miss. 15, 148 So. 226 (1933); Fisher v. State, 145 Miss. 116, 110 So. 361 (1926).
We have also held that a trial judge has the inherent power to grant a new trial of his own motion "where he is convinced that prejudicial error ha[s] been committed, or that the verdict is not supported by the evidence." Sanders v. State, 239 Miss. 874, 125 So.2d 923 (1961). We are of the opinion that the appellate court has the same duty to insure a fair trial and has no less inherent authority than that of a trial judge to require a new trial when we are convinced that justice demands it, and this is true although no specific reversible error has been called to our attention. Dickerson v. State, supra; Pegram v. State, 228 Miss. 860, 89 So.2d 846 (1956); Cole v. State, 217 Miss. 779, 65 So.2d 262 *429 (1953); Conway v. State, 177 Miss. 461, 171 So. 16 (1936).
We held in Fisher v. State, supra, that:
In passing upon an application for a change of venue the court looks to a completed trial, and if at any stage of the trial it appears that the case has been so prejudged, or that other conditions exist which prevent a defendant from securing a fair and impartial trial, the court should entertain the motion even though this appear upon a motion for a new trial. The object of the law is to give a person a fair and impartial trial, and if this result is obtained the court will not disturb its action. But if the court is satisfied clearly that it has not been obtained, it will reverse itself, set aside the judgment, and grant the motion. (145 Miss. at 129, 110 So. at 363)
Although it is apparent that at the time the motion for change of venue was made it was properly overruled, the facts and circumstances afterward shown in the record as the case developed clearly indicated that the defense attorney was at a disadvantage in presenting defendant's case. Defendant's local attorney, appointed by the court, had been permitted to withdraw. His attorney, appointed from another county, was not sufficiently aware of what had transpired prior to his appointment to permit him to properly cope with the case presented by the prosecution. The handicap of the defense counsel was particularly evident in the selection of the jury. The circumstances surrounding this case indicate that the popularity of the colored policeman killed by the defendant may have had much to do with the fact that the defendant was given the death penalty.
The above named members of this Court feel that, although this case was tried by lawyers of unusual ability, and that no one of the alleged errors prior to the verdict may be said to be a reversible error, nevertheless, considering the circumstances of the entire case, we are convinced that this case should not have been tried in Stone County and that the trial court should have sustained the motion for a new trial and changed the venue to another county. We, therefore, reverse and remand this case to the circuit court and direct that a new trial be granted the appellant and that the venue be changed to another county.
Reversed and remanded.
JONES, BRADY, PATTERSON and SMITH, JJ., concur.
ROBERTSON, J., and ETHRIDGE, C.J., GILLESPIE, P.J., and INZER, J., dissent.
ROBERTSON, Justice (dissenting):
I respectfully dissent. This was a hard-fought and well-tried case. The record is remarkably free from error, as clearly demonstrated in the first 17 pages of the 20-page majority opinion.
The majority opinion methodically and systematically takes up each of the many assignments of error and clearly and logically reasons and shows that there is no merit in any of them. In fact, I can wholeheartedly agree with all that is said in the first 17 pages.
It was not until the next to the last paragraph of their opinion that the majority finally mentions what led them to the conclusion that this case should be reversed. There they said:
"Defendant's local attorney, appointed by the court, had been permitted to withdraw. His attorney, appointed from another county, was not sufficiently aware of what had transpired prior to his appointment to permit him to properly cope with the case presented by the prosecution. The handicap of the defense counsel was particularly evident in the selection of the jury. The circumstances surrounding this case indicate that the popularity *430 of the colored policeman killed by the defendant may have had much to do with the fact that the defendant was given the death penalty."
With deference, I submit that no valid reason at all has been stated for reversing this case.
This defendant was well and intelligently represented and his counsel was diligent in his defense at every step of the trial. Defendant has had his day in court and has certainly been afforded due process. The jury was justified in finding the appellant guilty of cold-blooded murder and in imposing the supreme penalty.
I think that the judgment of the trial court should have been affirmed.
ETHRIDGE, C.J., GILLESPIE, P.J., and INZER, J., join in this dissent.