416 So.2d 383 (1982)
Edward Earl JOHNSON
v.
STATE of Mississippi.
No. 53017.
Supreme Court of Mississippi.
May 5, 1982.
Rehearing Denied June 30, 1982.
*384 Brown, Alexander & Sanders, R. Jess Brown, Jackson, Freeland & Gafford, James L. Robertson, Oxford, for appellant.
Bill Allain, Atty. Gen. by Charles W. Maris, Jr., Sp. Asst. Atty. Gen., Jackson, for appellee.
En Banc.
DAN M. LEE, Justice, for the Court:
This is an appeal from the Circuit Court of Leake County wherein Edward Earl Johnson, defendant/appellant, was indicted, tried and convicted for the June 2, 1979, capital murder of J.T. Trest, a police officer while acting within his official capacity. At the conclusion of the sentencing phase of Johnson's trial, the jury, finding the mitigating circumstances of the crime insufficient *385 to outweigh the aggravating circumstances, sentenced Johnson to death. We affirm.
Sometime between 2:00 a.m. and 3:00 a.m. on June 2, 1979, Sally Franklin, an elderly resident of Walnut Grove, was awakened by a knock at her back door. When she inquired as to who was there, a voice responded it was Fred Smith who had come to pay Clara's Avon bill. Miss Franklin refused to open the door but told the person who identified himself as Fred Smith that he could slip the money under a window. A $20 bill was slipped through the window, whereupon she went to her bedroom to get change and then returned to the window where she delivered the change. The subject refused to leave until she retrieved a certain type of cologne Clara wanted. However, when Miss Franklin went to get the cologne, she heard the screen tearing. She ran back and met the subject at the door. A struggle ensued. Just before Miss Franklin lost consciousness, she heard Carmen Dennis, a boarder at her home. Miss Franklin identified her attacker at trial as Edward Earl Johnson.
Robert Wright, who lived about twenty yards from Miss Franklin, was awakened by two shots around 2:20 a.m. He noticed a light on in Miss Franklin's kitchen, whereupon he slipped on his pants. Wright looked out the window again and saw a Buick automobile with an aerial on the back pass by. Mr. Wright then proceeded to Miss Franklin's. After discovering Miss Franklin's condition, Wright returned to his house and phoned the police. When he proceeded back to Miss Franklin's he met Dorothy and Rufus Carol Graves, another neighbor of Miss Franklin, who had been phoned by Carmen Dennis.
Robert Wright and Rufus Graves walked down the street about fifteen yards from Miss Franklin's home where they found J.T. Trest, the Town Marshal of Walnut Grove. Trest was lying face down in front of his patrol car. The car was parked at an angle facing Miss Franklin's home. The motor was still running, the lights were on and the driver's door open. Trest's pistol holster had been pulled behind his back; however, his pistol, a .357 Magnum, was not seen. A .25-caliber pistol was discovered between Trest's body and the curb.
Morris Tucker, who lived about a mile and a half from Miss Franklin, was informed of the incident by a phone call at 2:30 a.m. The bark of a dog prompted Tucker to look out his window where he saw a green automobile with tail lights across the rear and an antenna on the trunk disabled in front of his home. Another car arrived, whereupon a black male exited the stalled car. The second automobile then pushed the stalled vehicle in a northerly direction toward Madden.
Three bullets were removed from Trest's body during an autopsy. One bullet perforated both lungs while another bullet penetrated the heart. Although Dr. Feather-stone opined either bullet could have produced death, he stated the wound to the right ear was the primary cause of death. The three bullets recovered produced a defect measuring about six millimeters in diameter or roughly the size of a .32 or .25-caliber pistol. The wound to the head was about twelve millimeters in diameter, which indicated the weapon was at least a .38-caliber or larger. All the wounds occurred within a relatively short period with the three smaller caliber wounds being sustained first.
Appellant was picked up and questioned the following afternoon based upon information that officers received during their investigation. He was then taken to Miss Franklin's house and his height compared to the height of an outside overhead light bulb which had been unscrewed by Miss Franklin's attacker. Thereafter, he was questioned at city hall and released.
When it was discovered that appellant was seen in possession of a .25-caliber automatic pistol a week or so before the incident, appellant was asked to return to city hall on June 3, 1979, for further questioning. Appellant agreed to accompany Sheriff Joe Mack Thaggard and Rudolph Adcock to Jackson for the purpose of taking a polygraph examination. However, before *386 reaching Jackson, appellant told the officers he wanted to talk about it. He was advised of his rights, whereupon he gave an oral statement to the officers which was taperecorded. Appellant was placed under arrest and returned to the Leake County Sheriff's Office where he was again advised of his rights and a statement taken from him. This statement, in which appellant admitted killing Officer Trest after the break-in at Miss Franklin's home, was admitted into evidence and also led to the recovery of Officer Trest's pistol.
A criminologist from the Mississippi Crime Lab opined that all three projectiles removed from Trest's body were fired from the RG .25-caliber auto-loading pistol recovered at the scene of the crime by Sheriff Thaggard.
Appellant offered evidence of his good reputation for peace or violence in the community. Several witnesses also attested to appellant's presence at a card game until 2:00 a.m. on June 2, 1979. However, the location of the card game was only five or six miles from Miss Franklin's home.

GUILT PHASE
I. Did the trial court err in admitting evidence of the crimes of burglary and attempted rape with which appellant was not charged?
Appellant was indicted under Mississippi Code Annotated section 97-3-19(2)(a) (Supp. 1981), which provides:
(2) The killing of a human being without the authority of law by any means or in any manner shall be capital murder in the following cases:
(a) Murder which is perpetrated by killing a peace officer or fireman while such officer or fireman is acting in his official capacity or by reason of an act performed in his official capacity, and with knowledge that the victim was a peace officer or fireman. For purposes of this paragraph, the term "peace officer" means sheriff of counties and their deputies, constables, marshals and policemen of cities and towns, game wardens, parole officers, a judge, prosecuting attorney or any other court official, agents of the alcoholic beverage control division of the state tax commission, agents of the bureau of narcotics, personnel of the Mississippi Highway Patrol, and the superintendent and his deputies, guards, officers and other employees of the Mississippi State Penitentiary; ...
As a general rule, testimony in a criminal trial should be confined to the charge for which an accused is on trial and the prosecution should not be allowed to aid the proof against the accused by showing he committed other offenses. Tucker v. State, 403 So.2d 1274 (Miss. 1981); Wilborn v. State, 394 So.2d 1355 (Miss. 1981); Massey v. State, 393 So.2d 472 (Miss. 1981); and Gardner v. State, 368 So.2d 245 (Miss. 1979). However, there are exceptions to this rule as stated in Woods v. State, 393 So.2d 1319 (Miss. 1981):
In Gray v. State, 351 So.2d 1342 (Miss. 1977), the Court said:
"... It is well settled in this state that proof of a crime distinct from that alleged in an indictment is not admissible against an accused. There are certain recognized exceptions to the rule. Proof of another crime is admissible where the offense charged and that offered to be proved are so connected as to constitute one transaction, where it is necessary to identify the defendant, where it is material to prove motive and there is an apparent relation or connection between the act proposed to be proved and that charged, where the accusation involves a series of criminal acts which must be proved to make out the offense, or where it is necessary to prove scienter or guilty knowledge. See Smith v. State, 223 So.2d 657 (Miss. 1969), cert. denied, 397 U.S. 1030, 90 S.Ct. 1274, 25 L.Ed.2d 542 (1970); Cummings v. State, 219 So.2d 673 (Miss. 1969); cert. den. 397 U.S. 942, 90 S.Ct. 954, 25 L.Ed.2d 122 (1970).
(393 So.2d at 1325) (emphasis added.)
See also Saik v. State, 387 So.2d 751 (Miss. 1980).
*387 Appellant contends the incident at Miss Franklin's house was inadmissible due to the fact that he was charged with capital murder of a police officer and not felony murder. The case at bar, aside from appellant's confession, was circumstantial. There were no eyewitnesses to the shooting of Officer Trest. The testimony concerning the break-in and attempted rape was material to prove motive on the part of the appellant. In Murphy v. State, 129 Miss. 634, 92 So. 694 (1922), this Court stated:
It is also objected that the court erred in admitting evidence that the deceased and the defendants engaged in the manufacture of intoxicating liquors. This proof was produced by the state for the purpose of showing motive, and it is supplemented by proof in the record that the defendant stated that the deceased had been talking too much. Whenever the commission of another offense tends to establish a motive for the killing, and where the motive is a material question in issue, it is competent to introduce evidence of another offense which tends to prove motive. It was therefore not error to admit this evidence in this case.
(129 Miss. at 644, 92 So. at 696)
See also Dabney v. State, 82 Miss. 252, 33 So. 973 (1903), wherein we held:
Another, when one crime may have been perpetrated for, or as a means of committing, concealing, or escaping from another. Rex. v. Clewes, 4 Car. & P., 221... . (82 Miss. at 255, 33 So. at 974)
The evidence as to the burglary, attempted rape and shooting of Officer Trest was also admissible as part of the res gestae. Ellis v. State, 255 So.2d 325 (Miss. 1971).
Under the facts and circumstances of this case, the evidence was admissible to show identity of the accused, motive for the shooting and was also admissible as a part of the res gestae.
Perhaps the most compelling reason for the admission of the testimony concerning the crime committed upon Miss Franklin was that the appellant attacked her credibility because she failed to positively identify him on Saturday afternoon, after the attack upon her at 2:17 that morning, stating that she needed more time because she was in a state of shock and was confused due to the viciousness of the beating on her head and body as well as the attempt upon her life and safety. Appellant contended that it was inconsistent for Miss Franklin to fail to positively identify him on Saturday afternoon and then positively identify him the next day, Sunday. It is noted that appellant attacked the credibility of the identification made by Miss Franklin and elicited a great many of the details concerning the crimes committed upon her in explanation of why she was in a state of shock, being a woman over seventy years of age, requiring medical treatment on Saturday, which explained her failure to positively identify appellant the day of the homicide as opposed to her positive identification the following day. There was no error in the admission of this evidence.
II. Did the trial court err in failing to give a manslaughter instruction?
The only evidence bearing directly on the actual shooting came from defendant's statement, which is not at issue on appeal, and the testimony of Sammy Jamison, a trusty at the Leake County Jail, during appellant's incarceration. The testimony of Sammy Jamison was to the effect that appellant shot Trest after the two got into an argument. There is absolutely no evidence that Trest sought to arrest or search appellant prior to the shooting. Conceding for the sake of argument that Trest and appellant did quarrel and that Trest was not acting within his official capacity, the evidence still fails to establish manslaughter. In Gaddis v. State, 207 Miss. 508, 42 So.2d 724 (1949), this Court stated:
Words of reproach, criticism or anger do not constitute sufficient provocation to reduce an intentional and unjustifiable homicide from murder to manslaughter. Richardson v. State, 123 Miss. 232, 85 So. 186; Williams v. State, Miss., 26 So.(2d) 174; McLaurin v. State, 205 Miss. 554, 37 So.(2d) 8.
(207 Miss. at 515-16, 42 So.2d at 726)
*388 The mere fact that Trest and appellant argued before the shooting would not reduce the crime to manslaughter but may have constituted simple murder for which the jury was instructed. There was direct evidence, appellant's statement, which negated the crime of manslaughter. An instruction on a lesser-included offense should not be automatically or indiscriminately given. Before such an instruction should be given it must be warranted by the evidence. Spencer v. State, 348 So.2d 1030 (Miss. 1977); and Jackson v. State, 337 So.2d 1242 (Miss. 1976).
The manslaughter instruction sought by appellant provided:
The Court instructs the jury that the killing of a human being is manslaughter when done in the heat of passion upon sudden provocation and without malice aforethought, and if you find that the defendant, Edward Earl Johnson did kill J.T. Trest in the heat of passion after an argument or other sudden provocation, if any, but without malice aforethought, then you should find the defendant guilty of manslaughter, in which event your verdict should be written on a separate sheet of paper, need not be signed by you or any of you, and should be in the following form:
"We, the jury, find the Defendant, Edward Earl Johnson, guilty of Manslaughter."
Manslaughter is defined by Mississippi Code Annotated section 97-3-35 (1972) as:
The killing of a human being, without malice, in the heat of passion, but in a cruel or unusual manner, or by the use of a dangerous weapon, without authority of law, and not in necessary self-defense, shall be manslaughter.
In Busby v. State, 177 Miss. 68, 170 So. 140 (1936), this Court stated:

Instruction No. 4 purports to be a definition of manslaughter but is essentially erroneous. Section 996, Code of 1930, provides that "the killing of another in the heat of passion, without malice, by the use of a dangerous weapon, without authority of law, and not in necessary self-defense, shall be manslaughter." It will be noticed that the definition as contained in this instruction omits therefrom the phrases, "by the use of a deadly weapon, without authority of law, and not in necessary self-defense;" in other words, every man committing a homicide without malice, in the heat of passion, is guilty of manslaughter according to the instruction here under review. As the state saw fit in this case to instruct the jury on the crime of manslaughter, it would seem that it should have copied the statute. The instruction omits material elements of the crime of manslaughter. Perhaps we would not reverse this case because of this erroneous instruction if it stood alone. The appellant was convicted of murder, and therefore it cannot be said that the erroneous instruction as to manslaughter prejudicially affected him. Fleming v. State, 142 Miss. 872, 108 So. 143.
(177 Miss. at 81, 170 So. at 143)
Not only was the manslaughter instruction unwarranted by the evidence, the instruction tendered by appellant was erroneous because it omitted "by the use of a deadly weapon, without authority of law and not in necessary self-defense." The instruction was therefore properly refused.
III. Did the trial court erroneously overrule appellant's motion to quash the indictment on the grounds of racial discrimination in grand jury selection?
Appellant, under this proposition, alleges two specific errors: (1) the trial court erred in refusing to order the circuit clerk to produce his jury selection records via subpoena duces tecum and (2) the trial court erred in refusing to permit the circuit clerk to give testimony concerning his knowledge of the race of each juror.
On November 15, 1979, appellant filed his motion to quash the indictment, alleging systematic exclusion of blacks from grand jury duty and also in appointment of the grand jury foreman. The following day a hearing was held on the motion and Jimmy Clark, the Circuit Clerk of Leake County for the preceding twelve years, was called *389 as a witness. Clark approximated the number of registered voters in Leake County at 13,000 of which 35% to 40% were black and 60% to 65% white. Clark admitted that there had never been a black grand jury foreman during the twenty-four terms of grand jury while he served in office. When asked how many whites were called out of the 200 jurors per term, Clark was unable to answer.
An examination of the record reveals that the trial judge offered to cooperate in every conceivable way with appellant on his motion. The trial judge only wanted appellant to show that he had made a good faith effort to secure the information he needed from the circuit clerk's office. The trial judge offered additional time and assistance provided a good faith effort was shown. Furthermore, the cause did not actually go to trial until August 12, 1980. Time for filing motions was extended until December 3, 1979. Although the motion to quash the indictment was renewed on December 3, there was no evidence presented.
In view of these facts, it is inconceivable how appellant can complain that the trial judge restricted his opportunity to inspect and examine jury selection records. The trial judge offered more time and assistance to appellant if a good faith effort on his part was shown. The records were made readily available to appellant. However, evidently appellant made no effort. This Court cannot say the trial judge erred in limiting appellant's opportunity to prepare the proof under consideration on this proposition.
The grand jury that indicted appellant was composed of ten blacks and eight whites. The foreman was white; however, he was elected by vote of the grand jury members and then appointed by the trial judge. In Johnson v. State, 404 So.2d 553 (Miss. 1981), this Court held that the crucial period for determining discrimination did not begin to run until 1975 when the new Jury Selection Act went into effect. This period of time does not constitute such a significant period of time to enable this Court to determine whether there has been constitutionally-prohibited discrimination. This Court stated:
Under Mississippi procedure, the grand jury foreman is appointed by the trial judge after the grand jurors are selected in a random procedure as required in Mississippi Code Annotated section 13-5-26 (Supp. 1981). The foreman is administered a statutory oath, and the other grand jurors are administered an oath that they will be bound by the same oath taken by the foreman. Miss. Code Ann. § 13-5-45 (1972). The foreman has the authority to order subpoenas for all witnesses, swear the witnesses, and he keeps a record of the witnesses sworn for the court. Miss. Code Ann. § 13-5-63 (1972). Except for this authority, the foreman has no greater responsibility in the returning of indictments than any other grand juror; and, the grand jury serves for a very limited period of time. As a matter of common practice, any member of the grand jury may request the issuance of subpoenas and may call for any information or investigation authorized by law. Unlike the Tennessee statute, a grand jury foreman in Mississippi has no more discretionary responsibilities or duties than any other member of the grand jury.
(404 So.2d at 556)
See also Herring v. State, 374 So.2d 784 (Miss. 1979).
Aside from the fact that we held in Johnson that the period from 1975 until 1979 was insufficient to determine whether constitutionally-prohibited discrimination has occurred, the composition of the grand jury which indicted appellant consisted of a majority of blacks. Furthermore, the grand jury members, with blacks in the majority, elected their foreman prior to the same being appointed by the trial judge as provided by statute. Nor has there been any showing in the present case of specific acts by the trial judge evidencing intentional discrimination against appellant because of his race. There is no merit in this argument.
*390 In our opinion, there was no reversible error in the guilt phase of the trial and the case should be and is affirmed.

SENTENCING PHASE
IV. Did the trial court err in refusing to declare a mistrial when it was discovered that a juror was unable to read and write?
Mississippi Code Annotated section 13-5-1 (1972) provides that a juror must be able to read and write. Appellant moved for a mistrial when the jury was deliberating during the sentencing phase on the ground that Mrs. Eddie Leflore, a juror, was unable to read and write. The motion for mistrial was accompanied by an affidavit from Mrs. Zella Griffin, the juror's step-daughter. After the jury returned the death penalty, Mrs. Leflore was called to the stand where she asserted she was sick and dizzy and unable to read at the present time. Mrs. Griffin then took the stand and testified to her knowledge Mrs. Leflore could not read or write. When asked on cross-examination, Mrs. Griffin based her opinion on the fact that Mrs. Leflore could not differentiate between meal and flour and also that they had to fill out various papers in her behalf.
A subsequent hearing was held, whereupon Mrs. Leflore returned to testify even though she was still ill. Mrs. Leflore asserted she still could not read the instructions but stated she read the instructions "pretty good in yonder" (jury room) before she got sick. She also offered to write if given a pencil. Over and over Mrs. Leflore asserted she read the instructions in the jury room and her inability to read was due to her illness. Mrs. Leflore asserted she got sick the last day of court after the jury dispersed. She was taken to the doctor and then returned to the court to testify. The trial judge overruled the motion.
In Herring v. State, 374 So.2d 784 (Miss. 1979), this Court held a person who meets the other qualifications and can read and write only a few words is qualified as a juror. In Huggins v. State, 103 Miss. 227, 60 So. 209 (1912), this Court held:
On the motion for a new trial, evidence was introduced tending to show that one of the jurors could not read and write, which fact was unknown to counsel when the juror qualified on his voir dire. A complete answer to this assignment of error is that, while under section 2684 of the Code ability to read and write constitutes one of the qualifications of a juror, the section further provides that "the lack of such qualification on the part of one or more jurors shall not vitiate an indictment or verdict." We deem it unnecessary to notice the other assignments of error, most of which are frivolous, and all of which are untenable.
(103 Miss. at 234, 60 So. at 210)
The evidence presented on the motion was conflicting. Mrs. Griffin testified she believed Mrs. Leflore was unable to read and write. Mrs. Leflore asserted she read the instructions and it was only after the jury dispersed that she became ill, which prevented her from reading. In view of the fact that the evidence was conflicting, a factual dispute evolved for resolution by the trial judge. Therefore, this Court believes this assignment of error has no merit.
V. Did the trial court err in refusing Instruction D-15?
Instruction D-15 provided:
In your deliberations on the question of punishment, you are to presume that if you sentence Edward Earl Johnson to life imprisonment that he will spend the rest of his life in prison, and you are to presume that if you sentence Edward Earl Johnson to death that his execution will be carried out, and he will die in the gas chamber. You are to make no other presumptions regarding the aforesaid matters.
In Bullock v. State, 391 So.2d 601 (Miss. 1980), this Court held:
Instruction D-33 would have instructed the jury it was to presume that, if the accused was sentenced to life imprisonment, he would spend the rest of his life in prison, and the jury was to presume that, if the accused was sentenced to death, he will receive lethal gas until he *391 is dead. The instruction was improper and was calculated to confuse the jury. (391 So.2d at 610)
Instruction D-15 was properly refused.
VI. Did the trial judge unreasonably and illegally restrict appellant's attorney in his final argument at the penalty phase?
In Gray v. State, 351 So.2d 1342 (Miss. 1977), this Court stated:
At the punishment stage of the hearing the court required the defendant to proceed before the state. This was error because the state has the burden to prove, not only the guilt of the defendant, but also to prove aggravating circumstances as set forth in Miss.Gen. Laws Ch. 458 (1977). This is error which requires reversal of the punishment stage of the trial.
Further in the punishment stage the court limited the argument of defendant's counsel to twelve minutes. This was clearly an abuse of discretion because this stage of the trial is for the purpose of determining whether defendant will live or die and a defendant should be given ample time to fully argue this important question. The court also limited the content of the argument of defendant's counsel. The trial judge should not interfere with argument unless counsel clearly and conclusively exceeds the legitimate field of the argument. In the case of Nelms & Blum Co. v. Fink, 159 Miss. 372, 131 So. 817 (1930) this Court stated, with reference to argument of counsel, the following:
"Counsel necessarily has and must have to serve his function and office, a wide field of discretion. He may comment upon any facts introduced in evidence. He may draw whatever deductions seem to him proper from these facts, so long as he does not use violent and abusive language, and even in many cases invectives may be justified and even called for, as eloquently pointed out by Chief Justice Whitfield in Gray v. State, 90 Miss. 235, 43 So. 289. Counsel is not required to be logical in argument; he is not required to draw sound conclusions, or to have a perfect argument measured by logical and rhetorical rules; his function is to draw conclusions and inferences from evidence on behalf of his client in whatever way he deems proper, so long as he does not become abusive and go outside the confines of the record. Usually when the argument is considered as a whole it is found consistent and logical and frequently eloquent. Some of the greatest speeches in our history have been made within the courthouse. As has been said, the court cannot control the substance and phraseology of counsel's argument; there is nothing to authorize the court to interfere until there is either abuse, unjustified denunciation, or a statement of fact not shown in evidence.
"Counsel may draw upon literature, history, science, religion, and philosophy for material for his argument. He may navigate all rivers of modern literature or sail the seas of ancient learning; he may explore all the shores of thought and experience; he may, if he will, take the wings of the morning and fly not only to the uttermost parts of the sea but to the uttermost limits of space in search of illustrations, similes, and metaphors to adorn his argument. He may reach the uttermost heights of attainable eloquence, soar into the empyrean heights where his shadow may fall on the loftiest mountain top, as the eagle in its loftiest flight. He may borrow from every source, modern and ancient, such materials as he needs for his argument. He may clothe the common occurrences of life in the habiliments of poetry and give to airy nothings a habitation and a name. He may weave of words a rhetorical bouquet that enchants the ear and mesmerizes the mind. He may make the learning of the ages the servant of his tongue. His argument may be as profound as logic and learning can make them. He may give wing to his wit and play to his imagination so long as he does not imagine fact not in evidence, which the court does not take judicial knowledge of, or does not go out of the record for the facts not in evidence. As to the facts in evidence, *392 he may array them in such figures and form and clothe them with such ideas and conclusions as he can conjure up in his mind for the best interest of his cause. He cannot, however, state facts which are not in evidence, and which the court does not judicially know, in aid of his evidence. Neither can he appeal to the prejudices of men by injecting prejudices not contained in some source of the evidence. (159 Miss. at 382, 383, 131 So. at 820, 821)." (351 So.2d at 1346-47)
Defense counsel should not be unduly restrained in his closing argument at the punishment stage because this stage of the trial is for the purpose of determining whether a defendant will live or die. We reaffirm our previous holdings that counsel may draw upon literature, history, science, religion and philosophy for material for his argument; however, we refrain from deciding whether argument is limited to mere facts in evidence adduced at this stage of the trial.
The scope of appellant's argument in the case sub judice clearly exceeded the legitimate field of closing argument. Appellant's arguments were in effect an attack on the legislative enactment of the death penalty. The propriety of the death penalty was not at issue. These remarks were clearly improper and designed to excite the passions or prejudices of the jury. Clemons v. State, 320 So.2d 368 (Miss. 1975).
VII. Was the sentence of death mandatory and freakishly imposed?
Mississippi Code Annotated section 99-19-105 (Supp. 1981) provides:
(1) Whenever the death penalty is imposed, and upon the judgment becoming final in the trial court, the sentence shall be reviewed on the record by the Mississippi Supreme Court. The clerk of the trial court, within ten (10) days after receiving the transcript, shall transmit the entire record and transcript to the Mississippi Supreme Court together with a notice prepared by the clerk and a report prepared by the trial judge. The notice shall set forth the title and docket number of the case, the name of the defendant and the name and address of his attorney, a narrative statement of the judgment, the offense, and the punishment prescribed. The report shall be in the form of a standard questionnaire prepared and supplied by the Mississippi Supreme Court, a copy of which shall be served upon counsel for the state and counsel for the defendant.
(2) The Mississippi Supreme Court shall consider the punishment as well as any errors enumerated by way of appeal.
(3) With regard to the sentence, the court shall determine:
(a) Whether the sentence of death was imposed under the influence of passion prejudice or any other arbitrary factor.
(b) Whether the evidence supports the jury's or judge's finding of a statutory aggravating circumstance as enumerated in section 99-19-101; and
(c) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.
(4) Both the defendant and the state shall have the right to submit briefs within the time provided by the court, and to present oral argument to the court.
(5) The court shall include in its decision a reference to those similar cases which it took into consideration. In addition to its authority regarding correction of errors, the court, with regard to review of death sentences, shall be authorized to:
(a) Affirm the sentence of death; or
(b) Set the sentence aside and remand the case for modification of the sentence to imprisonment for life.
(6) The sentence review shall be in addition to direct appeal, if taken, and the review and appeal shall be consolidated for consideration. The court shall render its decision on legal errors enumerated, the factual substantiation of the verdict, and the validity of the sentence.
Since Jackson v. State, 337 So.2d 1242 (Miss. 1976), this Court has upheld the imposition of the death penalty in the following cases: Edwards v. State, 413 So.2d 1007 *393 (1982) No. 53,298, decided April 14, 1982, not yet reported; Bullock v. State, 391 So.2d 601 (Miss. 1980); Reddix v. State, 381 So.2d 999 (Miss. 1980); Jones v. State, 381 So.2d 983 (Miss. 1980); Culberson v. State, 379 So.2d 499 (Miss. 1979); Gray v. State, 375 So.2d 994 (Miss. 1979); Jordan v. State, 365 So.2d 1198 (Miss. 1978); Voyles v. State, 362 So.2d 1236 (Miss. 1978); Irving v. State, 361 So.2d 1360 (Miss. 1978); Washington v. State, 361 So.2d 61 (Miss. 1978), and Bell v. State, 360 So.2d 1206 (Miss. 1978).
We have held in Jackson, and pursuant to the above section, that cases in which a death sentence is imposed will be automatically reviewed as preference cases by this Court; that the record will be reviewed and compared with similar cases to determine whether the punishment of death is too great when the aggravating and mitigating circumstances are weighed against each other in order to assure that the death penalty will not be wantonly or freakishly imposed; and only will be inflicted in a consistent and even-handed manner under like or similar circumstances.
We have carefully reviewed those cases and compared them with the case and sentence sub judice. The only mitigating circumstances before the jury were the age of appellant[1] and the fact that he had no history of prior criminal activity. The aggravating circumstances were to the effect that the capital offense was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody and the capital offense was especially heinous, atrocious or cruel. Moreover, appellant showed no remorse for the death of Officer Trest.
When we compare the present case to other capital cases which have been affirmed by this Court on the death penalty, the present offense is equally as wanton, cruel, senseless, heinous and atrocious as those. The death penalty in this case was neither wantonly nor freakishly imposed.
We find that the sentence of death was not imposed in this case under the influence of passion, prejudice, or any other arbitrary factor; that the evidence supports the jury's finding of statutory aggravating circumstances as enumerated in Mississippi Code Annotated section 99-19-105(2), (3) (Supp. 1981); and, having considered both the crime and the appellant, we find that the sentence of death in this case is not excessive or disproportionate to those cases in which such sentence has been imposed.
Therefore, the judgment of the lower court is affirmed and Wednesday, the 14th day of July, 1982, is set as the date for execution of the sentence and infliction of the death penalty in the manner provided by law.
AFFIRMED AS TO GUILT PHASE; AFFIRMED AS TO SENTENCING PHASE.
PATTERSON, C.J., SMITH and SUGG, P. JJ., and WALKER, BROOM, ROY NOBLE LEE and BOWLING, JJ., concur.
HAWKINS, J., dissents.
HAWKINS, Justice, dissenting:
In deference to my colleagues, I believe the defense counsel was unduly restricted in his closing argument.
This is a close question, and I can easily understand a view different from my own. I can also understand the circuit judge ruling as he did. The record of 12 volumes reveals that the circuit judge was patient and courteous throughout the trial to an attorney charged with the most solemn of responsibilities. It is difficult to perceive a more arduous or unenviable duty than that imposed upon a circuit judge presiding over a death penalty case.
Yet the circuit judge did err, in my respectful view, in sustaining objections of the State to certain remarks made by defense counsel.
There is no more precious right in our jurisprudence than the free and unfettered argument of lawyers defending criminal cases. There is no better safeguard against *394 tyranny or dictatorship than the guarantee to all men that their lawyers need feel no threatening cloud of any kind hanging over them as they make their closing argument. This right is as vital to a free society as the right to trial by jury itself.
Not only is this a vital right, but a sacred right with which no appellate court should brook interference. I would be as loathe to interrupt defense counsel in making his argument to a jury as I would a minister conducting divine worship.
With the above general statements, I would think no court would disagree. Indeed, the majority has quoted the salutary language of Gray v. State, 351 So.2d 1342 (Miss. 1977). We diverge, however, upon the application of these principles to this case.
The almost complete absence in our reported cases of assignments of error on appeal of an erroneously restricted defense argument is an indication trial courts of this state have uniformly respected this right of an accused.[1]
There is a special significance in this case in that defense counsel was not arguing an ordinary criminal case. He was arguing against the death penalty. The defendant's case had advanced beyond the guilt phase, which had been established by a verdict of guilty.
The defense lawyer was arguing one issue only: should his client live or die. The jury was to determine whether he would be sentenced to the rest of his life in prison, or die in the gas chamber. Those twelve citizens of Leake County, and those alone, could make this decision.
The appellant's brief referred the Court to the closing argument given by the Honorable Joe W. Henry, Jr., a member of the Tennessee Bar, in a death penalty case in Pulaski County, Tennessee, reported in 46 A.B.A. Journal 52 (1960).
It will be helpful for me to quote the argument of the defense counsel in this case to which successful objection was made by the State, and then to extract sections of Mr. Henry's argument.
First, the defense counsel in this case argued:
Now, this is not a case dealing with simple murder. This is a case dealing with capital murder. Now, if you would try this same Defendant for simple murder, not capital murder, but if you were trying him for simple murder, just murder, you wouldn't be here deciding whether you should kill him or not.
BY MR. HUNTER:
I object to that, Your Honor.
BY THE COURT:
Sustained.
BY MR. BROWN:
Now, what I am saying is this, that  I put it this way. The law provides that in some cases where there's murder, they do not say that you can kill him, I don't care how 
BY MR. KILPATRICK:
We object to that, Your Honor. The Court has just ruled on it.
BY THE COURT:
Sustained.
* * * * * *
BY MR. BROWN:
... the Court allows you and permits you to bring back a verdict of guilty, if you feel that the State has proven a case beyond a reasonable doubt.
But you notice, they never did say all doubt.
BY MR. KILPATRICK:
To which I object, Your Honor.
BY THE COURT:
Sustained.
* * * * * *

*395 BY MR. BROWN:
All right, if you are Christians, you believe in the Ten Commandments, and one of these Commandments is I shall not kill. There can't be some little man over there in the Legislature write a law and come in here and tell you you can kill this man. Can't do.
BY THE COURT:
I am not going to let you go behind the Legislative purpose.
* * * * * *
BY MR. BROWN:
Now, the next thing is this. You know the person who fires the shot, is not always the one that is considered the murderer. If somebody, say, tells another person that you be down there tomorrow night and plan to kill a man. I will be in Chicago, but he comes down that street at such and such a time and is out there with a gun and kills him. All right, I am in Chicago the night of the crime. Oh, no, I didn't kill him. I didn't put my hands on that gun, but I am equally as guilty, although I am in Chicago at the time the man actually fired the shots.
BY MR. KILPATRICK:
To which we object, Your Honor.
BY THE COURT:
I am going to sustain that objection.
* * * * * *
BY MR. BROWN:
I will guarantee you this, and I will guarantee you this right now. That if that man, as a result of your determination that he should die in the gas chamber, I will bet you as I look in the faces of every one of you, you are going to remember that death date, and you are going to remember the time, and if you are in your bed at midnight, and I want you to listen to these words. You will think of him. You are not going to be up there looking at him. You are going to remember it. As he walks in there, you are going to remember it, that when they open that big steel door 
BY MR. KILPATRICK:
(Interposing) Your Honor, I would like to object.
BY THE COURT:
I am going to sustain that part of it.
* * * * * *
BY MR. BROWN:
Do you realize that this Defendant is in your hands, in your hands, and that's the thing. You know, there's a  I think there's something like some parable or something where they say that  a song or something, that indicates that we are in God's hands. Right now you are God. You are God. You are God now. You are the God. Every one of you are Gods. You are the twelve Gods. You are his God. That's the thing. You are now his God. You can spare his life, or you can kill him.
BY MR. HUNTER:
I object, Your Honor.
BY THE COURT:
Sustained. The objection is sustained.
We are asked to condone the circuit judge's restriction on this argument for three reasons: (1) telling the jury their verdict would "kill" the defendant, (2) criticizing the law imposing the death penalty, and (3) informing the jury in this case that they had the power of the Deity.
Mr. Henry's argument was a direct and eloquent attack on capital punishment, a law he argued should be abolished. In chilling detail he told the terrible story of the infliction of this punishment in a typical execution. He made it graphically clear to the jury they indeed exercised the sole power to put him to death.
I suggest a review of the extracted portions of Mr. Henry's argument set forth as an appendix to this opinion.
I do not believe it could be argued that Mr. Henry's argument was far more "inflammatory," or more likely to arouse "passion" or "prejudice" against the death penalty than anything the defense counsel attempted to say in this case.
Yet, the pretigious American Bar Association Journal saw fit to publish Mr. Henry's argument in full as an example to the national *396 Bar of the highest service and fidelity rendered by a defense counsel to his client.
Would this Court have denied Mr. Henry this argument in a court of our State? I cannot believe we would.
In those few brief moments when a defense lawyer stands before a jury pleading for the life of his client, he is entitled to his say. We may violently disagree with some of his statements. No matter. In a few minutes his lips are sealed and the State then has full opportunity to respond in the final statement to the jury.
The lawyer may have the gift of a Darrow or a Henry. He may be unlettered, crude, and fumbling. But, for those moments he is entitled to open every fiber of his being and relate to the jury the thoughts that come from the deepest recesses of his soul.
Each generation of free men owes a debt of gratitude it can never repay to those courageous lawyers in our history who have risked their livelihood, their liberty, and some even their lives in defending an unpopular cause, or an accused charged with a loathsome or heinous offense. If such exhibitions of moral and physical courage are inhibited, curtailed or threatened by any court in any manner, mankind loses.
That limits do in fact exist to a proper argument even in a case of this nature I cannot deny; of equal certainty in my mind, counsel did not reach such boundary.

APPENDIX
Fifty-three years ago, in a bleak and barren and God-forsaken building on the banks of the Cumberland River at 5:00 o'clock in the morning, a Negro man, made in God's own image, bearing the name of Julius Morgan, and from Dyer County, Tennessee, became the first citizen of our state to be legally murdered by electrocution.
Two years later, on July 8, 1918, the second kilowatt killing was conducted. This time the hapless victim was one, J.D. Williams, a Negro citizen, of Giles County.
The third time the stench of searing and scorched human flesh came out of our penitentiary was that same July day in 1918, when Eddie Olsup met his Maker at the hands of the civilized State of Tennessee and in order to preserve the peace and dignity of the state. He, too, was from Giles County.
In all, 123 persons have walked that last mile.
One hundred twenty-three times we have turned our backs upon the command of the Decalogue: Thou shalt not kill.
One hundred twenty-three times we have arrogated to ourselves the right to destroy the image of God on earth.
One hundred twenty-three times we have disputed the sacred idea that no man is beyond redemption.
One hundred twenty-three times we have reverted to our primitive and savage origin bred in generations in the jungle.
One hundred twenty-three times we have closed the door on a man's life and sent him to his Maker with a crime on his soul and guilt in his heart and denied him his God-given right to repentance, redemption and forgiveness.
One hundred twenty-three times we have usurped the divine authority of heaven.
One hundred twenty-three times prosecutors have sung their hymns of hate as hapless human beings prepared to hang down their heads and die.
One hundred twenty-three times we have proclaimed to the world that state government has no obligation to be civilized.
Who were these 123 men?
Their names are unimportant, but I have a list that shows them all  the roll of horror.
One cannot look at this yellow sheet  significantly it is yellow  the color denoting cowardice, the color of the Army's Dishonorable Discharge, the color that describes the worst fever known to man, the color that describes the jacket of the pestiferous hornet, the color that describes the worst brand of journalism  one cannot look at it *397 without thinking of all the widows and orphans we have made, of all the tears that were shed in their memory and of the God who loved them, but who was thrust from their hearts by the cold hand of vengeance.
Ten men and two women sit upon this jury. Five of you owe your spiritual allegiance to the Methodist Church; two to the Church of Christ; two to the Cumberland Presbyterian, and one to the Baptist Church.
All of you stated on your examination that you believed in God, that you accepted Jesus Christ as your personal Savior, that you subscribed to the precepts of the Christian religion, believed in the set of ethical standards proclaimed by Christ, believed in a future system of rewards and punishment, the forgiveness of sins, the resurrection of the body and the life everlasting.
In short, you are Christians and civilized citizens.

* * *
I ask that you erase from your minds any opinion that you may have on capital punishment until I have presented the case against capital punishment and have reviewed the issues and separated superstition from fact.

* * *
Men of good will recognize it to be incontestably true that we are our brothers' keepers, and just as a pebble cannot be thrown into the ocean without disturbing every drop of water in the sea, so one man cannot be abandoned and sacrificed upon the altar of society's sometimes unreasonable demands without disturbing all mankind.
Yes, we have made great progress.
Throughout the recorded history of time the human race has devised many and varied means of punishing those guilty of infractions of good order, and while we have not reached perfection, our progress has been praiseworthy.
There was a time when society thought that criminals should be beheaded, burned, boiled or buried alive; when men were strangled, stoned, skinned or starved to death; when they were torn asunder by trees fastened to their limbs, or devoured by wild beasts; when they were forced to drink poison, crucified, or drowned; when they were chopped in two while they were still alive, or eaten alive by insects or sewn in a bag with snakes  all of this in the name of justice and all because it was "the law of the state."
As odious and savage as these practices sound to us today, let's face the fact that a hundred years from now when capital punishment has long vanished from the American scene as it has in most of the other civilized countries of the world  electrocution will be listed as another barbarous punishment along with drawing and quartering  for I submit to you any punishment that takes the very life of a human being is barbarous, cruel, un-Christian, and uncivilized and a throwback to the Dark Ages.
Time was when pigs, horses and cattle were tried and executed for murder. It was the law of the state.
In 1474 a rooster was tried for the heinous and unnatural crime of laying an egg and sentenced, together with the egg, to be burned at the stake. It was the law of the state.
There is another, in 1801 of a British child being hanged for stealing a spoon. It was the law of the state.
There is a recorded case in England of a 9-year-old girl being hanged for stealing two pennies worth of salt. It was the law of the state.
There is another in 1748 of a boy of 10 who was executed for murder. It was the law of the state.
There is the case of the 12-year-old American boy who was hanged for stealing a sheep. It was the law of the state.
I am sickened every time I hear a prosecutor apologetically asking for the death penalty and offering the pitiful excuse "It's the law of the state".

* * *
There was a time in England when pickpockets were hanged and when the public *398 hangings took place the pickpockets gathered and picked the pockets of those who came to witness the execution.
The death penalty did not deter the 7,000 people in America who committed murders in 1958.

* * *
To me, one of the most compelling arguments against capital punishment is the possibility of mistake. Moreover, every lawyer and judge knows that bold, bald, unblushing perjury all too frequently stalks into our courts and makes a mockery of that intangible commodity we call justice.

* * *
God, Himself, set the first precedent. Cain gazed upon the beaten and bleeding body of his own brother. The denunciation of Heaven was ringing in his ears. He expected to find vengeance at every hand. But God did not visit capital punishment on him. Instead, He banished him from society, placed a mark upon him  a mark of his crime, but also a mark that would warn the rest of mankind against his destruction. This was the judgment of Almighty God in dealing with the first murder and I submit that it is exempt from any possibility of error.

* * *
What if David and Moses had been executed because "It is the law of the state?"

* * *
Ladies and gentlemen of the jury, centuries after the Mosaic Law and almost 2,000 years ago, a solitary wayfarer walked the shores of the Sea of Galilee, healing the sick and casting out the demons that possessed the mentally ill. Persecuted by the mighty Roman Empire, crucified by the edict of a court composed of His own countrymen, denied thrice by one of His trusted disciples in His hour of greatest need, and betrayed by the traitorous deed of another, mocked, spat upon and ridiculed, He, a victim of capital punishment, died the most ignominious death known to His day, and yet He was not deterred and His teachings of faith, hope, charity, courage and love have endured unto this day and wherever free men have instituted free government, the very cornerstone has been the ethical standards taught by Jesus of Nazareth.
There are those who forget:
The mild benevolence of His precepts,
The meekness of His spirit,
The philanthropy that breathes in all His words,
The Golden Rule which He established,
The Christian charity which He taught.
When they quote the Bible as a sanction for the death penalty, they pervert the spirit of His holy and merciful religion.

* * *
You have been told in great detail just precisely how Wash Jones killed and murdered Wes Howard. Now let us see how the State of Tennessee would kill and murder Wash Jones.
At about 5:30 in the afternoon of the eve of the execution the prisoner is shaved, bathed and his head is clipped. He must be clean so that it is unnecessary to bathe his body after the electrocution. His head must be clipped so they can apply the electrode.
Then they give him a new shirt and a new pair of pants, without a belt, and shoes without laces. No belt and no shoe laces. After all he must not hang or strangle himself and cheat the chair.
Next, the minister of his choice visits him to offer whatever words of assurance and solace he can conjure up.
Then the condemned man is given an opportunity to eat a hearty meal of his choice.
Then his family is permitted to visit with him until midnight. Then at about ten minutes to five the warden and the guards and the execution party come and they start to walk the last mile down the dim-lit corridor, which leads to the chamber of horrors to the electric chair.
They place him in the chair, roll up his trouser legs in order to clamp the electrode to his right leg. Then to his clipped head they clamp the other electrode.
*399 Then they ask him for his last words. Only the prisoner, the warden and God are present in the room. The warden is doing his statutory duty, the prisoner paying his debt to society and as to him, I am sure he feels that God has forgotten him.
Then they place the mask upon his face  not for his benefit, but to keep the witnesses from looking upon the hideous countenance of the dying man as his facial features contort in pain and agony.
The warden looks through the little window at the man who throws the switch  $25.00 the state pays for this service  the warden has a stop watch in his hands and upon his signal the switch is thrown. Then, there comes the sound from the electrician's niche  a sound like that that comes from an X-ray machine, a crackle, a whine, a buzz as 2,300 volts, for thirty seconds and then 500 for one and one-half minutes are sent circulating through his body as it convulsively jerks and writhes.
And then when his body has cooled off enough to touch, the physician applies his stethoscope and pronounces him dead.
He is then placed in cold storage, in a deep freeze  because the state does not embalm. Now another name is added to the yellow list  the roll of horror  the state has got another pound of flesh. But it is the law of the state.
I ask you in the name of all that is sacred and holy, how can such a spectacle as this ever magnify the law or make it honorable or preserve the peace and dignity of the state?
And they say that Wash Jones killed in cold blood.
Wash didn't lock Wes Howard in a room, keep him there for weeks and months, announce ahead of time the date and time of his death, and leave the condemned man to die a thousand deaths.
Ladies and gentlemen, you and you alone can send Wash Jones to the electric chair. There can be no division of responsibility, you can never say that the rest overpowered you. It must be your deliberate, cool, premeditated act. It takes your vote.
I plead for human consideration, for charity, for mercy. Man was truly created in God's image, but humane treatment of our fellow man is necessary in order that the divine image may not be obscured.
I hope and pray that the Tennessee legislature will at this session veto this unconscionable decree of blood and write for the state, as the state has written for its citizens, the injunction at once rational, scriptural, salutary and humanitarian: "Thou shalt not kill".
NOTES
[1] Appellant was nineteen years old when the crime occurred.
[1] Gray v. State, cited in the opinion, is the only case we have found in which a defense attorney complained of having his argument restricted. The substantial body of case law involving exceeding bounds of propriety in criminal cases concern statements by prosecuting attorneys in closing arguments. See: Reed v. State, 232 Miss. 432, 99 So.2d 455 (1958); Harris v. State, 209 Miss. 141, 46 So.2d 91 (1950); Herrin v. State, 201 Miss. 595, 29 So.2d 452 (1947); and Gray v. State, 90 Miss. 235, 43 So. 289 (1907), and cases annotated under key number 723 Criminal Law, West Digest.